IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DONALD M. HILL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. 3:05-CV-1820-P |
| | § | |
| JUPITER ESOURCES, LLC, | § | |
| | § | |
| Defendant, | § | |
| | § | |
| v. | § | |
| | § | |
| | § | |
| DMH & ASSOCIATES, LLC, | § | |
| | § | |
| | § | |
| Third-Party Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Now before the Court is Defendant Jupiter eSources, LLC's ("Defendant" or "Jupiter") Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment, filed on June 23, 2006. Plaintiff Donald M. Hill ("Plaintiff" or "Hill") and Third-Party Defendant DMH & Associates ("DMH") filed a Response on July 13, 2006, and Defendant filed its Reply on July 28, 2006. After reviewing the briefing and applicable law, the Court GRANTS IN PART and DENIES IN PART Defendant's Motion for Summary Judgment.

### I. Background and Procedural History

Jupiter is an Oklahoma-based limited liability company in the business of retrieving, compiling and storing information from federal bankruptcy databases, which it then delivers to

its customers. (Pl.'s Compl. ¶ 5.) Hill states he is an independent marketing specialist with a substantial background in the bankruptcy recovery industry. (*Id.* ¶ 7.) In 2002, Hill entered into a contract ("2002 Agreement") with Jupiter in which he agreed to market Jupiter's Automated Access to Court Electronic Records program ("AACER").[1] (Def.'s Br. in Supp. of Mot. for Summ. J. ("Def.'s Br.") at 1.) The 2002 Agreement provided as follows:

> Donald M. Hill (you) will represent [Jupiter] for the purposes of marketing AACER. You will be entitled to a commission compensation of ten percent (10%) of the revenue amounts received by [Jupiter] from Hill Customers (as defined below) for AACER and other products related thereto of [Jupiter] . . . . You will be entitled to receive the commission compensation on Hill Customers' revenues received by [Jupiter] until . . . you no longer actively maintain principal customer service contact with such Hill Customer. . . . Principal customer service contact shall mean that you routinely monitor and follow the Hill Customers' involvement and satisfaction with AACER and keep [Jupiter] informed about the Hill Customers' level of satisfaction with AACER.

(*Id*. at 5.) Defendant avers that the commission payments are contingent upon Hill's maintaining "principal customer service contact," as defined by the contract, with these customers. (*Id.* at 2. ) The 2002 Agreement specifically provides that it is governed by Oklahoma law. (Def.'s App. at 169 ¶ 6.)

The parties reconfirmed the 2002 Agreement in 2005 ("2005 Agreement") when Hill assigned his commissions to Third-Party Defendant DMH, a company jointly owned by Hill and his wife. (Def.'s Mot. for Summ. J. ("Def.'s Mot.") ¶ 12.) The 2005 Agreement reiterated the expectations described in the 2002 Agreement and did not change the basis upon which Jupiter would pay commissions. (*Id.*) Moreover, the 2005 Agreement emphasized that, although Jupiter

---

[1] AACER is a bankruptcy management and information gathering tool designed for use by lenders, bankruptcy servicers, and attorneys. (Def.'s Br. at 1.)

would make payments to DMH, it would only do so as long as Hill himself performed the duties contemplated under both agreements. (Def.'s App. at 170 ¶ 4.)

National Bankruptcy Services ("NBS"), a provider of bankruptcy management and outsourcing services to secured creditors, is the largest customer Hill generated under this agreement. (Def.'s Br. at 2.) Jupiter alleges NBS is also its competitor. (*Id.*) According to Jupiter, customers who track bankruptcy filings themselves purchase AACER directly from Jupiter; however, customers who outsource bankruptcy services use AACER through NBS, resulting in a reduced profit to Jupiter.[2] (*Id.*) To alleviate and accommodate this potential conflict, Jupiter agreed to a "Marketing Lockout" for the initial twenty-one month period of its AACER contract with NBS, during which Jupiter did not directly market AACER to current or prospective NBS customers. (Def.'s Mot. ¶ 16.) As a Hill Customer, NBS received its "principal customer service contact" from Hill pursuant to the 2002 Agreement, and from January 2003 until March 2005, Jupiter paid Hill $170,000 in commissions for the NBS account. (Def.'s Br. at 2.)

Jupiter ceased paying Hill commissions after March of 2005 when Hill became the Executive Vice President of Marketing of NBS. (*Id.*) In connection with this employment, Hill signed an allegedly exclusive employment agreement ("NBS Agreement"), which provides that Hill would devote his "best efforts and his business time and services solely to NBS." (*Id.* at 3.) To this end, paragraph 1.2 of the NBS Agreement provides that:

---

[2] NBS purportedly pays a reduced price for AACER, as compared to Jupiter's other customers; as such Jupiter maintains it receives a reduced profit if customers outsource their bankruptcy services through NBS, rather than buying directly from Jupiter. (Def.'s Br. at 18-19.)

> [F]or the 90-day period commencing on the Effective Date, Executive [Hill] may complete work-in-progress for . . . Jupiter eSources . . . provided that the time spent on such matters is minimal, is not conducted during normal business hours, and would not be reasonably expected to interfere with the performance of Executive's duties hereunder.

(*Id.* at 8 (quoting NBS Agreement ¶ 1.2).) In paragraph 6.1, to which paragraph 1.2 is subject, the NBS Agreement further prohibits Hill from working for any business that "derives more than five percent (5%) of its revenue from a business that provides bankruptcy management services with respect to secured loans, tax liens, or student loans." (*Id.* at 9.)

Upon learning of Hill's employment agreement with NBS, Mike Bickford, Jupiter's chief manager, sent Hill an email offering to terminate their business relationship and explaining that, pursuant to his employment agreement with NBS, Hill could no longer function as the principal customer service contact for Hill Customers. (Def.'s Mot. ¶ 40.) Hill did not respond, prompting Bickford to send a letter on July 26, 2005, setting forth Jupiter's position that Hill was no longer entitled to commissions. (*Id.* ¶ 45.) When Jupiter discontinued commission payments, Hill brought this action for breach of contract.[3] (*See generally* Pl.'s Compl.)

Jupiter asserts that the NBS Agreement prevents Hill from acting as the "principal customer service contact" to Hill Customers and Hill voluntarily terminated his right to commission payments when he entered into the NBS Agreement, as provided by the plain language of the 2002 Agreement. (*Id.*) Jupiter further alleges that the signing of the NBS Agreement was a repudiation of the 2002 and 2005 Agreements (collectively "the Agreements")

[3] Jupiter answered and asserted identical counterclaims and third-party claims against Hill and DMH. (*See generally* Def.'s First Am. Answer.) DMH then answered and brought counterclaims against Jupiter identical to those claims brought by Hill. (*See generally* Third Party Def.'s First Am. Answer.)

that exonerated Jupiter from performing its duties under the Agreements from that time forward. (Def.'s Br. at 3.) Additionally, Jupiter asserts a breach of contract counterclaim and third-party claim against Hill and DMH for accepting payment under the Agreements after Hill was no longer able to perform his obligations, and seeks restitution of any money paid after Hill signed the NBS Agreement. (Def.'s Answer at 8-9.)

Jupiter also claims that Hill's and DMH's claims are barred by Hill's breach of two contractual duties stemming from the Agreements. First, Jupiter states as a counterclaim, third-party claim and affirmative defense that Hill breached the fiduciary duty he owed to Jupiter as its agent. (Def.'s Mot. ¶ 20.) Jupiter asserts that Hill acted as an agent of Jupiter by addressing prospective customers with emails in which he referred to himself and the company as one and helping the principals at Jupiter negotiate contracts. (*Id.* at ¶¶ 9–10, 20.) Next, Jupiter avers that Hill breached his duty of good faith and fair dealing by affirmatively acting to frustrate Jupiter's reasonable expectations under the Agreements. (*Id.* at 3, 13.) Because of these two duties, Jupiter alleges Hill was required to fully disclose his dealings with NBS and not take any action adverse to Jupiter; however, Hill did not disclose that NBS was paying him under a Consulting Agreement to market its services during his tenure with Jupiter, nor did he disclose the NBS Agreement. (Def.'s Br. at 3-4.) In fact, Jupiter allegedly learned of Hill's employment and prior dealings with NBS in May 2005 from NBS's Chairman of the Board. (*Id.* at 12.)

Conversely, Hill and DMH claim that Hill is still entitled to commissions under the Agreements because the only contractual duty he had was to market AACER and generate leads for Jupiter. (Pl. & Third Party Def.'s Resp. ("Pl.'s Resp.) at 4.) If Hill Customers continue to

provide revenue to Jupiter after Hill's contact with the customers ceases, Hill is entitled to continued commission. (*Id.*) In response to Jupiter's averment that he had a continuing customer service obligation upon which the commission depends, Hill and DMH state that the term "principal customer service contact" in the 2002 Agreement is ambiguous, and in operating under the 2002 Agreement prior to April 2005, the obligation was "de minimus," requiring little time and effort on Hill's part. (*Id*. at 8.) Hill alleges that Jupiter accepted his minimal performance as satisfactory from the time of the 2002 Agreement and cannot now redefine the term to require a higher level of performance from him. (*Id.*) Therefore, the restrictive clauses in the NBS Agreement act only to prohibit his active recruitment of clients for Jupiter, and not the provision of de minimus customer service, as required by his interpretation of the 2002 Agreement. (*Id.*) Therefore, Hill could continue to perform these minimal duties concurrently with his NBS employment, and Jupiter improperly terminated his commission payments. Based on these assertions, Hill and DMH allege breach of contract, or alternatively, quantum meruit claims against Jupiter.

Hill and DMH also aver that Hill is an independent contractor and not an agent of Jupiter, and therefore owes no fiduciary duty to Jupiter. (*Id*. at 1.) To support this assertion Hill states that, as an independent marketing representative, he served several customers, including Jupiter, simultaneously, he had no authority to contract on Jupiter's behalf or to set sale prices, he used his own resources to generate leads, and he conducted business free from Jupiter's control. (*Id.* at 4, 7.) Additionally, Hill and DMH allege that Jupiter has waived the affirmative defense of breach of the duty of good faith and fair dealing, and in any event, Hill did not breach this duty

because Jupiter knew of his dealings with NBS when he disclosed to a Jupiter executive around the time of the 2002 Agreement that NBS owed him money. (*Id.* at 9.) Furthermore, any payment Hill received from NBS before the NBS Agreement was for work he had done prior to the signing of the 2002 Agreement. (*Id.*) Finally, Hill and DMH maintain any non-disclosure is inconsequential because NBS and Jupiter are not competitors as NBS provides bankruptcy outsourcing services and Jupiter only provides technology and information through AACER. (*Id.*)

Based on the above events, Jupiter now moves for summary judgment of Hill's and DMH's claims for breach of contract and quantum meruit, and also Jupiter's counterclaims and third-party claims.[4] (*Id.*)

## II. Summary Judgment Standard

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party bears the burden of informing the district court of the basis for its belief that there is an absence of a genuine issue for trial and of identifying those portions of the record that demonstrate such an absence. *Celotex*, 477 U.S. at 323. However, all evidence and the reasonable inferences to be

---

[4] Jupiter alleges four counterclaims and third-party claims in its Answer including breach of contract, breach of fiduciary duty, restitution / unjust enrichment, and a request for a declaratory judgment. Jupiter fails to address each claim specifically in its motion, but rather generally requests summary judgment on all counterclaims and third-party claims. For this reason and the reasons stated herein, the Court DENIES Jupiter's Motion for Summary Judgment with respect to all counterclaims and third-party claims.

drawn therefrom must be viewed in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). In addition, the court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Once the moving party has made an initial showing, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmovant must provide specific facts that show the case presents a genuine issue of material fact, such that a reasonable jury might return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Mere assertions of a factual dispute unsupported by probative evidence will not prevent summary judgment. *Id.* at 248-50; *Abbott v. Equity Group*, 2 F.3d 613, 619 (5th Cir. 1993). In other words, conclusory statements, speculation, and unsubstantiated assertions will not suffice to defeat a motion for summary judgment. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to his case and on which he bears the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23; *Washington v. Armstrong World Indus., Inc.*, 839 F.2d 1121, 1122 (5th Cir. 1988). Finally, the Court has no duty to search the record for triable issues. *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

## III. Breach of Contract

### A. Voluntary Termination

Jupiter first asserts that it could not have breached the Agreements because Hill voluntarily terminated such Agreements. Jupiter contends that, by its terms, the NBS Agreement prohibits Hill from fulfilling his obligation as the "principal customer service contact," and thus Hill's signing of the NBS Agreement terminated the Agreements and Jupiter properly ended payments upon notice of the NBS Agreement. Moreover, Jupiter maintains that Hill and DMH breached the Agreements by accepting payments from Jupiter after signing the NBS Agreement.

#### 1. The 2002 Agreement

As stated above, Hill contends the term "principal customer service contact" is ambiguous, and there remains a "genuine issue of fact as to whether Hill was required to provide any additional service to JeS other than generate leads to receive commissions." (Pl.'s Br. at 4.) Under Hill's interpretation of the term, he could continue to perform his obligation with Jupiter under the terms of the NBS Agreement. Jupiter asserts that the language is not ambiguous as defined in the contract and Hill could not continue to perform under the Agreements' clear terms.

"A contract is ambiguous if it is susceptible to at least two different constructions;" however, a contract is not necessarily ambiguous just because the parties disagree or press for a different construction. *Pitco Prod. Co. v. Chaparral Energy, Inc.,* 63 P.3d 541, 545-46 (Okla. 2003). To decide whether a contract is ambiguous, courts look to the plain and ordinary meaning of the language in the context of the whole agreement to give effect to all provisions.

*Id.* "The language of a contract is to govern its interpretation, *if the language is clear and explicit*." 15 Okla. Stat. § 154 (emphasis added).

The 2002 Agreement clearly indicates that Jupiter will pay Hill commissions until Hill is no longer able to be the principal customer service contact for those customers. In his role as the "principal customer service contact," Hill is to "routinely monitor and follow the Hill Customers' involvement and satisfaction with AACER and keep [Jupiter] informed about the Hill Customers' level of satisfaction with AACER." (Def.'s Br. at 5.) The 2002 Agreement fails to provide any guidelines as to how often Hill should "routinely" contact Hill Customers or what specific responsibilities Hill must perform in order to "monitor" the customers' satisfaction. The term "principal customer service contact" as defined in the contract, when looking at the contract as a whole, does not have a plain and ordinary meaning; rather, the performance required by this term could range from minimal contact with customers on rare occasions to daily interaction and a detailed following of each customer's involvement with AACER. The Court finds the term is reasonably susceptible to one or more interpretation, and thus ambiguous when looking only to the plain language of the contract.

"If the language of a contract is ambiguous, the surrounding circumstances must be considered in determining the intent of the parties." *W. Gas Processors v. Woods Petroleum Corp.*, 15 F.3d 981, 986 (10th Cir. 1994). Moreover, "[i]n ascertaining the intent of the parties, the *trier of fact* may consider the course of performance, course of dealing, and usage of trade." *Id*. (also stating that, "if [a] court determines [the] contract is ambiguous, 'thereafter, there exists

a question of intent which the trier of fact must resolve.'" (quoting *Intermountain Brick Co. v. Valley Bank*, 746 P.2d 427, 430 (Wyo. 1987) (internal citations omitted))).

Hill and Jupiter disagree about what exactly the contract requires of Hill as the "principal customer service contact" and present conflicting evidence regarding the parties intent and understanding of Hill's duties at the time of contracting, and the parties' subsequent course of performance. The trier of fact must evaluate this evidence to determine the parties' intent. Thus, the Court determines that the term "principal customer service contact" is ambiguous, and a genuine issue of material fact remains as to the precise meaning and requirements of that term.

**2. The NBS Agreement**

As a threshold issue, Hill and DMH assert that Jupiter is seeking to enforce the NBS Agreement and has no standing to do so because Jupiter is not a party or third-party beneficiary to the NBS Agreement. (Pl.'s Br. at 7.) The Court finds this argument without merit. Jupiter is not trying to enforce the terms of the NBS Agreement; rather, Jupiter uses Hill's stated obligations under the NBS Agreement as evidence of Hill's alleged breach of the disputed terms of the 2002 Agreement.

Jupiter states that if the Court adopts Hill's and DMH's limited interpretation of his obligations as the "principal customer service contact," Hill could not perform even these minimal duties under the terms of the NBS Agreement. The NBS agreement requires Hill to "devote his best efforts, and substantially all his business time and services" to NBS. (Def.'s App. at 236.) Jupiter argues that, by implication, Hill could not also serve as the "principal customer service contact."

Paragraph 1.2 of the NBS Agreement specifically provides for a ninety-day window in which Hill can complete "work-in-progress" for Jupiter; however, the NBS agreement does not define what this "work-in-progress" entails. Moreover, in an email from Hill to NBS executive Bob Taylor on July 6, 2005, Hill stated, "I trust that you remain satisfied that my obligations to NBS are being fulfilled and are not inconsistent with my commission contract with [Jupiter]." (Pl.'s App. at 80.) It is clear that NBS contemplated Hill continuing some work for Jupiter during this interval, but exactly what work Hill could continue during this ninety-day window, or more specifically whether Hill could continue to serve as the "principal customer service contact" under the 2002 Agreement, is not explicit or definitively implied in the NBS Agreement as Jupiter suggests. Rather, the parties' intent as to what work NBS would allow Hill to continue for Jupiter at the time they formed the NBS Agreement is unclear; thus, the Court finds that, regardless of the meaning of "principal customer service contact," there is a fact issue as to whether Hill could continue to serve in this capacity during the ninety-day period.

Additionally, Paragraph 6.1 of the NBS Agreement prohibits Hill from working for any entity that derives more than five percent of its revenue from a business that provides bankruptcy management services with respect to secured loans, tax liens, or student loans. Jupiter's Chief Manager Michael Bickford states in his affidavit that Jupiter derives more than five percent of their revenue from a business that provides bankruptcy management services. (Def.'s App. at 359.) Hill and DMH do not refute this evidence, but rather misconstrue the meaning of the

clause.[5] Thus, the Court finds Jupiter is "a business that derives more than five percent (5%) of its revenue from a business that provides bankruptcy management services with respect to secured loans, tax liens, or student loans." (*Id*. at 240.)

By the plain language of paragraph 6.1, Hill is prohibited from working for Jupiter in any capacity from the date the NBS Agreement was signed. However, if paragraph 6.1 explicitly prohibited Hill from continuing to work for Jupiter in any capacity from the date of the NBS Agreement, paragraph 1.2, which allows Hill ninety days to continue "work-in-progress" for Jupiter "subject to" paragraph 6.1, is meaningless. Under general principles of contract interpretation, a contract must be read as a whole in an effort to give effect to all of its provisions. *Salt Lake Tribune Publ. Co., LLC v. Mgmt. Planning, Inc.,* 454 F.3d 1128, 1137 (10th Cir. 2006). Further, "specific and exact terms are given greater weight than general language." *Chiles v. Ceridian Corp*., 95 F.3d 1505, 1513 (10th Cir. 1996) (quoting Restatement (Second) of Contracts § 203(c)). Paragraph 2.1 explicitly allows Hill to complete "work-in-progress" for Jupiter, while paragraph 6.1 is a general non-compete clause. Taking the provisions together, while giving greater weight to the specific clauses in paragraph 2.1, the Court finds paragraph 6.1 is not a prohibition against Hill working for Jupiter during that ninety-day window provided for in paragraph 2.1. However, paragraph 6.1 does prohibit Hill from working for Jupiter after that initial ninety-day period is over. This interpretation of the NBS

---

[5] Hill and DMH argue that Jupiter does not derive more than five percent of its revenue from the provision of bankruptcy management services with respect to secured loans, tax liens, or student loans. However, the clause states that Hill is barred from working in any capacity for a company that derives at least five percent of its revenue *from a business* that provides such bankruptcy management services. Thus, whether Jupiter actually provides bankruptcy management services is inconsequential.

Agreement is not inconsistent with the other clauses of the NBS Agreement, but seeks to give effect to the contract as a whole.

Thus, the Court determines that there is a genuine issue of material fact as to what the 2002 Agreement required of Hill as the "principal customer service contact," and whether the NBS Agreement prohibited Hill from serving in that capacity during the ninety-day term provided by paragraph 2.1. The Court further finds that after this ninety-day period, paragraph 6.1 strictly prohibits Hill from working in any capacity or earning commissions from Jupiter. In sum, Jupiter is entitled to summary judgment on the parties' breach of contract claims with respect to commissions paid *after* this ninety-day period, but is not entitled to summary judgment with respect to commissions paid *during* this ninety-day period.

**B. Anticipatory Repudiation**

In addition to asserting that Hill voluntarily terminated the Agreements, Jupiter claims Hill repudiated the Agreements by signing the NBS Agreement.

"[A] repudiation is . . . a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach." RESTATEMENT (SECOND) OF CONTRACTS § 250 (1981); *Franconia Assocs. v. United States*, 536 U.S. 129, 142-43 (2002). Under the doctrine of anticipatory repudiation, a party who makes a "distinct, unequivocal, and absolute declaration of an intent not to perform may be held liable for a breach of contract." *Bourke v. W. Bus. Assocs.*, 120 P.3d 876, 883 (Okla. Civ. App. 2005). "In the case where one party repudiates the contract with respect to a performance not yet due, the aggrieved party may suspend his own performance." OKLA. STAT. ANN. TIT. 12A § 2-610 (West 2006).

To support their assertion of anticipatory repudiation, Jupiter again argues that from the moment Hill signed the NBS Agreement, he was no longer able to act as the "principal customer service contact" and thus, Jupiter, the non-repudiating party, was alleviated of its duty to perform under the contract. As explained above, a genuine issue of fact remains as to whether Hill could act as the "principal customer service contact" for Jupiter during the ninety days after he signed the NBS Agreement. Thus, the Court finds insufficient evidence of a "distinct, unequivocal, and absolute declaration of [Hill's] intent not to perform" during this ninety-day period, and Jupiter is not entitled to summary judgment based on the theory of anticipatory repudiation.

In sum, the Court GRANTS IN PART and DENIES IN PART Jupiter's Motion for Summary Judgment with respect to the parties' breach of contract claims.

## IV. Breach of Fiduciary Duty

Jupiter avers that Hill is an agent, and consequently a fiduciary, under the Agreements. Jupiter asserts that Hill's and DMH's claims are barred by Hill's breach of his fiduciary duty, and moreover, Jupiter is entitled to damages or restitution of previously paid commissions. Hill and DMH counter that Hill is an independent contractor with no fiduciary duty to Jupiter.

An agent owes a fiduciary duty to its principal. *Geman v. SEC*, 334 F.3d 1183, 1189 (10th Cir. 2003). The law does not presume an agency status is present, and the burden of proof as to the nature and extent of the relationship between the parties rests on the party asserting the relationship. *See Enter. Mgmt. Consultants, Inc. v. State ex rel,* 768 P.2d 359, 362 (Okla. 1988). Courts determine the status of the parties from an examination of the surrounding facts and the interaction of the parties. *Id.* An essential element of agency is that the principal have some

degree of control over the conduct and activities of the agent. *See McGee v. Alexander,* 37 P.3d 800, 807 (Okla. 2001). If the facts show control by the principal, then agency can be established regardless of the labels used by the parties themselves. *Enter. Mgmt. Consultants, Inc.*, 768 P.2d at 362.

Although Hill argues that if found to be an independent contractor he is not an agent, and therefore owes no fiduciary duty to Jupiter, the relevant law states that agency and independent contractor status are not mutually exclusive. *See Cahill v. Waugh,* 722 P.2d 721, 724 (Okla. Civ. App. 1986). "An independent contractor is an agent in the broad sense of the word in that he does something for another at his request." *Id.*

In support of its claim of agency, Jupiter presents evidence that Hill represented himself and Jupiter as one company when communicating with customers. He also set up meetings and assisted in arranging contracts with Jupiter and prospective customers and carried business cards identifying himself as a part of Jupiter. In addition, Hill had to report to Jupiter to insure that the prospective customers he found were acceptable. Hill, on the other hand, points to evidence that he paid his own expenses and had complete discretion to identify leads and provide minimal customer service to the customers brought to Jupiter. While the Court agrees with Hill that a person functioning *solely* as an independent contractor is not an agent and does not have a fiduciary duty, the key issue in determining if Hill in fact owed a fiduciary duty is whether he functioned as both an independent contractor and an agent or solely as an independent contractor. The Court finds that, in construing the evidence in a light most favorable to Hill, he

has presented evidence to allow a reasonable jury to determine that he is solely an independent contractor without an agency relationship or fiduciary duty to Jupiter.[6]

Therefore, the Court DENIES Jupiter's Motion with respect to their counterclaim and third-party claim for breach of fiduciary duty.

**V. Implied Duty of Good Faith and Fair Dealing**

Jupiter also asserts as an affirmative defense that Hill breached his implied duty of good faith and fair dealing. Hill and DMH first state that Jupiter failed to specially plead this affirmative defense in its answer, and therefore waived such defense pursuant to the Federal Rules. *See* Fed. R. Civ. Pro. 8(c) (stating "[i]n pleading to a preceding pleading, a party shall set forth affirmatively . . . any . . . matter constituting an . . . affirmative defense"). The Tenth Circuit has found that, although the best procedure is to clearly plead an affirmative defense in an answer, a party can raise such defense for the first time in a motion for summary judgment if it will not prejudice or unduly suprise the other party. *Ahmhad v. Furlong*, 435 F.2d 1196, 1201-02 (allowing a defendant to plead an affirmative defense not pled in his answer in a motion for summary judgment because the plaintiff still had fair notice of the defense prior to trial); *see also Ball Corp. v. Xidex Corp.*, 967 F.2d 1440, 1443-44 (10th Cir. 1992) ("This court has held that the purpose behind rule 8(c) is that of putting plaintiff on notice well in advance of trial that defendant intends to present a defense" (internal citation omitted)).

Jupiter states in its Answer that Hill's and DMH's claims are barred by his breach of fiduciary duty and "other duties," and also references Hill's and DMH's alleged

---

[6] Because the Court finds a fact issue exists as to whether Hill owed a fiduciary duty to Jupiter, the Court does not reach the issue of whether Hill breached the purported fiduciary duty.

misrepresentation and fraud. Assuming this does not state an affirmative defense of breach of the duty of good faith and fair dealing, the Court finds under the Tenth Circuit standard Hill and DMH at least had fair notice of Jupiter's intent to raise this affirmative defense by the allegations in both the answer and motion for summary judgment. As such, allowing Jupiter to plead the affirmative defense of breach of the duty of good faith and fair dealing will not prejudice Hill and DMH.

Every contract in Oklahoma contains an implied duty of good faith and fair dealing, and a breach of this duty results in a breach of contract. *See Wathor v. Mut. Assurance Adm'rs, Inc.,* 87 P.3d 559, 561 (Okla. 2004). The duty of good faith and fair dealing requires that "neither party . . . act to injure [the] reasonable expectations nor impair rights or interests of the other to receive benefits flowing from contractual relationships." *First Nat'l Bank & Trust, Co. v. Kissee,* 859 P.2d 502, 509 (Okla. 1993).

Jupiter asserts that in contracting with NBS during his tenure with Jupiter, and failing to disclose the same, Hill impaired Jupiter's expectation to benefit from the Agreements. However, Jupiter has admitted that Hill, under the plain language of the 2002 Agreement, had the option to end the relationship with Jupiter by ending his customer service performance. (Def.'s Mot. at 6.) Jupiter clearly contemplated Hill's voluntary cessation of the contractual relationship, whether it be by Hill's death or choice to discontinue. A reasonable jury could find that as an independent marketing consultant, by contracting with NBS, Hill voluntarily ended the relationship with Jupiter per the terms of the 2002 Agreement; therefore, Hill could not be said to have acted to impair Jupiter's expectations. As discussed above, a fact issue exists as to whether Hill's signing

of the NBS Agreement terminated or prohibited the Agreements with Jupiter; accordingly, a fact issue exists as to whether Hill's signing of the NBS Agreement was a breach of his duty of good faith and fair dealing.

Additionally, Jupiter avers that Hill failed to disclose his Consulting Agreement with NBS, under which he marketed NBS's services to potential clients during his tenure with Jupiter, prior to the signing of the NBS Agreement. Jupiter further alleges that Hill breached his duty of good faith and fair dealing by failing to disclose this agreement because NBS is a competitor of Jupiter. However, Hill states that NBS and Jupiter are not direct competitors. In any event, Hill states that any payment he received from NBS pursuant to this Consulting Agreement was for work he had completed prior to the signing of the 2002 Agreement and Hill disclosed this to Jupiter. Again, there is an issue of fact as to whether Hill was in breach of the duty of good faith and fair dealing by his conduct prior to the signing of the NBS Agreement, and Jupiter is not entitled to summary judgment on this basis.

## VI. Quantum Meruit

Hill and DMH alternatively assert Hill is due commission worth the actual services he performed under the quantum meruit theory of contract law. Jupiter counters that this theory is inapplicable where the obligation performed is covered by an express agreement.

Oklahoma courts recognize actions "grounded on a promise that a defendant would pay a plaintiff [for his services] as much as he should deserve." *Martin v. Buckman*, 883 P.2d 185, 193-94 (Okla. Civ. App. 1994). However, quantum meruit generally applies where there is no express agreement or an express agreement is silent as to the performance rendered. *Brown v.*

*Wrightsman*, 51 P.2d 761, 763 (Okla. 1935). The 2002 Agreement expressly addresses under what conditions Hill earns commissions. Although the Court has found certain provisions of the 2002 Agreement ambiguous, an agreement exists nonetheless, and quantum meruit applies only in the absence or silence of an agreement. Consequently, the Court finds that Hill and DMH are not entitled to commissions under the quantum meruit theory.

In sum, the Court GRANTS Jupiter's Motion for Summary Judgment with respect to the quantum meruit claim.

## VII. Conclusion

For the foregoing reasons, the Court hereby GRANTS IN PART and DENIES IN PART Defendant's Motion for Summary Judgment.

**It is so ordered.**

Signed this 21st day of September 2006.

Jorge A. Solis

JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE